UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
IN THE MATTER OF R.V.B,
a minor child under the age of 16,

GERMAN MUSSINI BUENAVER,

                Petitioner,

    -against-

MARIA MUNOZ VASQUEZ,

                Respondent.
-----------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   JUL 0 7 2014   ★

**LONG ISLAND OFFICE**

MEMORANDUM AND ORDER

13-CV-4354

(Wexler, J.)

APPEARANCES:

      LAW OFFICE OF ANN MARQUEZ, ESQ.
      BY: ANN MARQUEZ, ESQ.
      Attorney for Petitioner
      535 Fifth Avenue, 4th Floor
      New York, New York 10017

      LAW OFFICES OF JEREMY D. MORLEY
      BY: NEIL J. SALTZMAN, ESQ.
      Attorney for Respondent
      230 Park Avenue, 10th Floor
      New York, New York 10169

WEXLER, District Judge:

      Petitioner German Mussino Buenaver ("Petitioner" or "Father") brings this action

pursuant to the International Child Abduction Remedies Act, 42 U.S.C. § 11601-11 (1998)

("ICARA"), which implements The Hague Convention on the Civil Aspects of International

Child Abduction ("the Hague Convention" or "Convention"). The action is brought against

Maria Munoz Vasuez ("Respondent" or "Mother") and seeks a order returning Petitioner's and

Respondent's child, R.V.B. ("Child" or "R.V.B.") from New York to Columbia pursuant to the

terms of the Hague Convention.

I.     Findings of Fact

The Court makes the following findings of facts from the testimony and exhibits admitted during the trial of this matter on November 7 and 14, 2013, the parties' post-trial submissions on January 24, 2014:

1.     The Marriage and Subsequent Divorce

Petitioner and Respondent were married in Columbia.  Respondent's Findings of Facts and Conclusions of Law ("Resp. Findings"), at 6.  On January 31, 2005, their child, R.V.B. was born in Cali, Columbia.  See Petitioner's Exhibit ("Pet. Ex.") A: Birth Certificate.  By order dated June 2, 2009 of the Seventh Family Court in Cali, Columbia, Petitioner and Respondent were divorced (the "Order").  The Order states:

> With respect to the minor [R.V.B.], the spouses have agreed that parental rights will
> continue to be exercised by both parents; the custody and personal care will be held by
> the mother.

Pet. Ex. B, paragraph Sixth.[1]

The Order further defines the Father's visitation with the Child, on alternate weekends, Tuesday and Thursday evenings from 4-7 pm each week, and alternating vacation time each year during Holy Week.  Summer vacation and "end of year" vacation in December until school resumed in January, would be shared equally.  Id.  The Father was also ordered to pay child support in the amount of one million five hundred thousand pesos (COP $1,500,000) and 80% of

---

[1]The parties provided English translations of the original Columbian documents.
References to specific language or pages within a document refer to the English translation
version, where applicable.

additional expenses, such as school materials and medical expenses. Id.[2]

The Father, a commercial pilot with Avianca Airlines, exercised his rights of visitation, although there were occasional changes to the schedule due to the Father's work schedule or other reasons. The Mother testified that during a six-month period from January to June 2011, the Father visited with the Child on thirteen occasions. Tr., at 116-117. There were times the Mother conceded some of her time to the Father due to his flight schedule, Tr., at 58-50; 117; 144, and at least one occasion when the Father cared for the Child while the Mother went away. Tr., at 152. The Father paid child support as directed, including tuition at a private school. Tr., at 150-151.

In February 28, 2011, the Mother "summoned the father of the minor...for the purpose of requesting an increase in the fee for child support..." See Pet. Ex. C: Minute of Conciliation Hearing, at 1. The Mother and Father entered into an agreement, approved by the Ministry of Social Welfare in the Republic of Columbia, to increase the amount of child support paid by the Father on a monthly basis to one million seven hundred twenty-five thousand pesos (COP $1,725,000) (the "Modification"). Id. By the terms of the agreement, the Mother and Father ratified the terms of the earlier Order, including visitation rights. The Modification states that "the custody and personal care" will be held by the Mother, and further states:

> The parents are obliged to provide their daughter with support, stimuli, good example, care, attention, affection and dedication required to fully, efficiently and satisfactorily fulfill their obligation, aimed at the minor being brought up in an environment surrounded

---

[2]The Mother testified that there were two occasions during the marriage that she called the police on the Father for domestic violence charges, in April 2007 and June 2009. There was a third incident that was not reported to the police, also in 2009. Transcript ("Tr."), at 121-124. The Mother testified that they mutually agreed to an uncontested divorce following that second incident. Tr., at 154-155. The Order makes no reference to domestic violence allegations.

by safety, discipline, affection, organization, respect and proper attention of her formation, friendships and healthy psychological development.

Id. The Modification makes no mention of the shared "parental rights" addressed in the earlier divorce decree Order. Id.; compare with Pet. Ex. B, paragraph Sixth.

### 2. Removal of R.V.B. to New York

There is no material dispute concerning the circumstances surrounding the removal of R.V.B. from Columbia to New York. The Father was aware of and consented to the Child traveling with the Mother to visit the Mother's sister, Maria Patricia Vasquez, in New York from December 16th to December 26, 2011. Tr., at 18. The Mother acknowledged that she needed to Father's consent to take R.V.B. on vacation. Tr., at 178, 179-180. In fact, he provided the ticket for R.V.B. to go and saw her off at the airport. Id. Yet, R.V.B. did not return to Columbia as the Father expected on December 26th. When the Father realized the Child was not on the plane, he called the Mother's mother to find out what happened, and was told that the Mother said she would not be returning to Columbia. Id., at 19. On January 1, 2012, the Father received a phone call from the Mother, who confirmed she would not be returning to Columbia. Tr., at 27.

### 3. Father's Attempts to Locate the Child

On January 5, 2012, the Father made a criminal complaint with the Attorney General's office in Columbia, claiming the Mother's "arbitrary exercise over child minor custody," and requesting that the Attorney General's office track down the whereabouts of his daughter. See Pet. Ex. E: Attorney General's Office Criminal Notice Form, at 6. On January 23, 2012, the Father wrote to the Office of Children's Issues at the Columbian Institute for Family Welfare

("ICBF")[3] seeking help in locating the Child in New York, stating the Mother said she would not return to Columbia, and that Father only had the sister's phone number, but no address. See Pet. Ex. F: Letter to Office of Children's Issues, January 23, 2012; Tr., at 20.

By letter dated September 17, 2012, the Branch District Attorney of Fiscalia wrote to the ICBF stating that "this Delegate is conducting the preliminary investigation of the reference, and your intervention is required for the purpose of guaranteeing the rights on the minor involved in this case." See Pet. Ex. G; Tr. at 21-22. The ICBF thereafter generated a Proceeding for Out-of-Court Attention dated September 18, 2012, describing the petition as a "Proceeding for Reestablishment of International Rights" brought by the Father. It describes the Father's earlier request of January 2012 "for the start of the process of the location of his child," for which he was referred to the District Attorney's office. The petition further states that the Father having provided a document from the District Attorney's office "prompts the ICBF to begin the restitution process." See Pet. Ex. J: Republic of Columbia, ICBF, Office of Citizen Services, Proceeding for Out of Court Attention, dated September 18, 2012.

On September 19, 2012, the Father wrote to Dr. Ilvia Ruth Cardeas Luna, Adoptions Chief Deputy, ICBF National Headquarters, who the Father testified is the Columbian representative for the Hague Convention. He wrote the letter because he was "[v]ery sad and tired because the authorities were not responding as quickly as [he] desired." Tr., at 26; Pet. Ex. I: Letter to Dr. Ilvia Ruht Cardeas Luna. The Father wrote that he had two phone calls with his daughter since she left nine months earlier, and did not have any information about her

---

[3]While it is not reflected on the document itself, the Petitioner's counsel stated this letter was written to the ICBF, the "central authority in Columbia," without objection from Respondent's counsel. See Tr., at 19-20, Ex. F.

whereabouts in New York. The Columbian Consulate in New York would not provide the information without authorization from the Mother. See Pet. Ex. I, at 1.

On October 8, 2012, the Father submitted an application in Columbia under the Hague Convention of October, 1980 on the Civil Aspects of International Child Abduction. See Pet. Ex. J: Hague Application. It describes the Child and includes a photograph and her birth record, and all information concerning her possible location, including the name of the Mother's sister in New York. By letter dated June 11, 2013, the Father's attorney in New York received a letter from the U.S. Department of State stating most recent records indicate the Child was residing at 302 Randall Avenue, Elmont, NY 11003. See Pet. Ex. M: U.S. Dept of State letter, June 11, 2013, at 2.

On August 1, 2013, the Father filed his petition under the Hague Convention with this Court (the "Petition"). See Pet. Ex. K; see also Docket entry 1. Once filed, the U.S. Marshal was directed to serve the Petition on Respondent Maria Munoz Vasquez. Dawn Mahoney of the U.S. Marshal's Service testified that she attempted to serve the petition on August 22, 2013. After conducting an internet search of the Mother's location and finding the address of 147 Hunnewell Avenue, Elmont, N.Y., Ms. Mahoney went to that location. Tr., at 68-73. There, Ms. Mahoney spoke with Maria Patricia Vasquez, the Mother's sister, who reported that the Mother had moved out a few months earlier and she did not know where she and the Child were. While there, Ms. Mahoney also learned that the Mother worked at a Checkers restaurant nearby, and so she went there and spoke with the manager, Marilyn Lopez. Tr., at 73-75. Ms. Lopez reported that the Mother no longer worked at Checkers, and had rented an apartment from her for a short time, but was no longer living there. Further attempts to find the Mother in the neighborhood

were unsuccessful. Tr., at 75-76. The next day, an attorney on behalf of Ms. Vasquez contacted the U.S. Marshal's office, eliminating the need for further attempts by them to serve the Petition. Tr., at 77-78.

### 4. R.V.B.'s Life in New York

The Mother testified that when she first came to New York, she and R.V.B. lived with her sister and her sister's family in Elmont, New York, where she and R.V.B. stayed for about a year. Tr., at 105. Soon after arriving in New York, beginning in January 2012, R.V.B. enrolled in school and attended first grade at the Clara H. Carlson School ("Clara") in the Elmont Union Free School District. See Pet. Ex. N: Report Card, Grade 1; see also Tr., at 92, 169. R.V.B.'s report card notes she "has made new friends" and "has progressed." She had a separate report card for the English as Second Language ("ESL") program she was taking at school, which notes her teacher's amazement at how much English she had leaned so quickly, and that work was needed to catch up her on reading and writing skills. Ex. N., at 3; see also Tr., at 135-136. While at Clara, in April and June 2012, R.V.B. was awarded the Sponge Award and Student of the Month in her ESL class. See Respondent's Exhibits ("Resp. Exs."), R5 & R6.

For second grade, R.V.B. attended a different school in the Elmont School District, Covert Avenue School. Pet. Ex. O: Report Card, Grade 2; see also Tr., at 169-172. R.V.B.'s ESL Report Card in the 2012-2013 school year, her second grade year, notes her progress and her excellent work habits. See Resp. Ex. R2. Yet, her classroom report card notes that she is not meeting grade level expectations in reading, writing, math, science or social studies. See Pet. Ex. O; Tr., at 137-138. The Mother testified that while at Covert, R.V.B. was awarded the Student of the Month. See Resp. Ex. R3; Tr., at 95. Following second grade, at the suggestion of her

teachers, R.V.B. attended an ELS summer program before starting third grade to help her get her

reading and writing skills to grade level. See Tr., at 96, 140, 175-176; Resp. Ex. R4: Academic

Summer School Program Certificate of Completion at Dutch Broadway School 2013.

In September 2013, after she and her Mother moved to Bayside, Queens, R.V.B. started

attending another school in that neighborhood. Tr., at 172-174; see also Resp. Ex. R7: Letter

from Bayside School Re: After school program. Since starting the school in Bayside, she attends

an after-school program three days a week, which includes classes on chess, yoga and cooking.

Tr., at 100; 173-174; Resp. Ex. R7. R.V.B. also receives tutoring help for math, reading and

language, see Tr., at 101; Resp. Ex. R8: Letter from tutor, and in the summer of 2013, began

taking tennis lessons. Resp. Ex., R9: Letter from tennis instructor; Tr., at 102. The Mother

testified that R.V.B. has adopted English very well, speaking English with her friends, watching

TV in English, and reading and writing all of her schoolwork in English. Tr., at 98-99.

Socially, her mother testified that R.V.B. has made several friends, both in and out of

school and from her old school, attends birthday parties, and socializes with the relatives who

live locally. Tr., at 102-103. She has medical insurance through Health First and receives

regular medical care. Tr., at 105-106; 141.[4] The Mother says R.V.B. does not ask for her

friends from Columbia. Tr., 108. Various photos reflect R.V.B. with her family, her friends and

classmates. Resp. Ex. R14. A friend of the Mother, Ms. Narciza Rueda testified, stating that she

and the Mother met in a park in Bayside and their daughters are in school together. Ms. Rueda

stated that R.V.B. gets along well with the other children, is very smart and mature, and is

interested in getting involved with various activities, including swimming, which she used to do

---

[4]The Mother does not have medical insurance. Tr., at 141.

in Columbia. Tr., at 193-195.

    5.  Living Arrangements and the Mother's Employment

While the record of the chronology of where the Mother lived since arriving in New York is unclear, upon questioning from the Court, the Mother testified that after living with her sister for almost a year, she and R.V.B. moved to 453 Cameron Avenue, Elmont, a second floor apartment belonging to a friend for which she paid $300.00 a month in rent. They stayed there for five months, until they moved to the apartment in which they live now, in Bayside, paying $1,000 per month for rent. Tr., at 184-185. The Mother and R.V.B. currently live in this apartment by themselves, Tr., at 106-107, 139, and R.V.B.'s school, P.S. 31, is a block away.[5] Tr., at 107, 196; see also Resp. Ex. R7: Letter from Bayside School re: after school program.

The Mother works cleaning houses and offices and babysitting. Tr., at 107. Upon furthering questioning by the Court, the Mother testified that she did not work and was essentially supported by her sister for the year that she lived with her. They had a family disagreement that caused the Mother to move out with R.V.B., but their relationship is fine now.[6] Tr., at 180-181. The Mother began work cleaning houses, and worked at a laundromat for a short period of time. Tr., at 181. There was also testimony that she worked at Checkers for a time. Tr., at 73-75. Currently, she cleans houses and babysits if asked. Tr., at 182. In 2012 and 2013, the Mother testified she earned approximately $550.00 per week. Tr., at 182.

---

    [5]There is also reference in the record to living at a Kirkman Avenue address, Tr., at 139, or a Kingston address, Tr., at 183. Yet, the parties apparently agree that the Mother and R.V.B. have lived in three – not four or five – different locations since arriving in New York. See Petitioner's Proposed Findings of Fact and Conclusions of Law, ¶ 37; Respondent's Post-Trial Memorandum of Law, at 20.

    [6]The Mother's sister did not appear or testify in Court.

When the Mother and R.V.B. came to New York, it was on tourist visas. Tr., at 119, 184. The Mother's visa expired in either March or April of 2012, Tr., at 185-186, and she applied for residential immigration status in September 2012 for her and R.V.B., stating that she had custody of R.V.B. Tr., 118-119, 186-188. The Mother testified that because she is in the process of soliciting a residential visa, if she leaves the country, she will not be able to re-enter for ten (10) years. Tr., at 189-190.

The Mother claims that she was never in hiding from the Father since arriving in New York. He never emailed the Mother once between the time she and R.V.B. left Columbia and the filing of the Petition, even though her email address was still the same. Tr., at 46; 111-114. She also testified that she had given the Father her sister's address in New York as 147 Hunnewell, Elmont, in July 2011, six months before she left, as well as her sister's cell phone number, neither of which changed while she was living there with the Child. Tr., at 115.

6. In Camera Interview of R.V.B.

The Court conducted an *in camera* interview of the Child, with just the lawyers of the Parents present. R.V.B. stated that she understood that her Father wanted to take her back to Columbia, but that she "didn't like Columbia that much" and she likes America "[m]uch, much better," since she feels that "this is a better place for me to be. I see my future here." She would like to be a lawyer. Tr., at 197. She talked about her friends, and how she likes tennis, and hopes to do swimming. She and her mother share a two-bedroom apartment but she sleeps with her mom since she is scared of the dark. Tr., 199-200. In response to a question by Petitioner's counsel, R.V.B. stated her Father is "very nice to me so is my mom." "I love them the same. I love them both." Tr., at 203.

DISCUSSION

I.     <u>Legal Principles</u>

The objective of the Hague Convention is "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1; <u>see</u> <u>Lozano v. Montoya Alvarez</u>, 572 U.S. –, 134 S.Ct. 1224, 1228 (2014), <u>Abbott v. Abbott</u>, 560 U.S. 1, 7-8 (2010).

The International Child Abduction Remedies Act, 42 U.S.C. § 11601-11610 (1988) ("ICARA") provides the legal framework to implement the Convention in the United States. ICARA's provisions are "in addition to and not lieu of the provisions of the Convention." 42 U.S.C. § 11601(b)(2); <u>Ozaltin v. Ozaltin</u>, 708 F.3d 355, 360 (2d Cir. 2013). A court adjudicating an action under ICARA shall do so according to the terms of the Convention, and may decide only "rights under the Convention" and refrain from deciding "the merits of the underlying child custody claims." <u>Id</u>, § 11603(d); 11601(b)(4); <u>Ozaltin</u>, 708 F.3d at 360. If a petitioner prevails, the court must "order the return of the child forthwith." <u>See</u> Hague Convention, art. 12; <u>Ozaltin</u>, 708 F.3d at 360.

Here, the Father has filed a petition under 42 U.S.C. § 11601 seeking return of the Child to Columbia, and for an order directing Respondent to pay legal fees and costs pursuant to 42 U.S.C. § 11607.

1.     <u>Prima Facie Application of the Hague Convention</u>

The Hague Convention protects against the "wrongful removal" of a child from his or her habitual place of residence in breach of custody rights. <u>See</u> Hague Convention, article 3; <u>Blondin</u>

-11-

v. Dubois, 189 F.3d 240, 245 (2d Cir. 1999) ("Blondin II"); Blondin v. Dubois, 238 F.3d 153,

157 (2d Cir. 2001) ("Blondin IV").  Under ICARA, the petitioner has the burden of proving by a

preponderance of the evidence that the child's removal was wrongful within the meaning of the

Convention.  42 U.S.C. § 11603(e)(1)(A);  In re D.T.J., 956 F.Supp.2d 523, 528 (S.D.N.Y.

2013).

> Specifically, article 3 states that:
>
> The removal or the retention of a child is to be considered wrongful where
>
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention, art. 3.

The Convention draws a distinction between "rights of custody" versus "rights of access."

"Rights of custody" include those "relating to the care of the person of the child and, in

particular, the right to determine the child's place of residence." [7]  See Hague Convention, art. 5.

As noted above, article 3 specifically applies to rights of custody as opposed to rights of access.

A. Timing of Petition for Return of Child

If an action for return of the child has been commenced within one year of the wrongful

---

[7]Under the Convention, "'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence."  See Hague Convention, art. 5.

removal or retention, the judicial authority "shall order the return of the child forthwith." See Hague Convention, art. 12. If more than one year has passed before proceedings have commenced, the authority "shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Id. The respondent opposing return of the child must show that the child is settled by a preponderance of the evidence. See 42 U.S.C. § 11603(e)(2)(B); Lozano v. Montoya, 134 S.Ct. 1224, 1229 (2014).

　　　2.　Affirmative defenses

　　　In addition to proving the child is well-settled if one year has passed, if the petitioner has made a prima facie case that the Convention applies and the child is to be returned "forthwith," the respondent may attempt to prevent that by proving certain affirmative defenses available under the Hague. The ones argued here are whether the Child will suffer grave risk of harm if returned, and that the Child is of sufficient age and maturity that its objections should be considered. See Resp. Findings, at 23-29.

　　　　　i.　Grave Risk of Harm

　　　Article 13 of the Convention outlines that the judicial authority is not bound to return the child if it can be established that a) the person with the rights was not actually exercising them, or had consented or acquiesced to the removal or retention, or b) there is a "grave risk" that return would "expose the child to physical or psychological harm" or otherwise place him or her in an "intolerable situation." See Hague Convention, art. 13. While preponderance of the evidence applies to whether custody rights were actually exercised or waived, "grave risk of harm" must be shown by "clear and convincing evidence." 42 U.S.C. § 11603(e)(2)(A).

ii. Opinion of the Child

The Convention also permits that the judicial authority may refuse to order the return of the child "if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. This is evaluated by the preponderance of the evidence. See 42 U.S.C. § 11603(e)(2)(B); Jakubik v. Schmirer, 956 F.Supp.2d 523, 528 (S.D.N.Y. 2013).

II. Disposition of the Petition

1. Prima Facie Case under the Hague Convention

Under the Hague Convention, a "wrongful removal" includes one "in breach of rights of custody ... under the law of the State in which the child was habitually resident." Reyes Olguin v. Santana, 2005 W.L. 67094 (E.D.N.Y. 2005) (quoting Blondin IV, 238 F.3d at 157 (quoting the Convention, art. 3); see also Ozaltin, 708 F.3d at 366 (citations omitted).

A. Rights of Custody

Whether a petitioner has "rights of custody" is a matter of treaty interpretation. Yet, "the *substance* of those custody rights, however, is provided by the domestic law" where the child habitually resided. Ozaltin, at 367 (emphasis in original) (citing Abbott v. Abbott, 560 U.S. 1, 130 S.Ct. 1983, 1991, 176 L.Ed.2d 789 (2010)). As stated by the Second Circuit, "[i]n other words, domestic law (including certain public decisions and private agreements) supplies the substance of parental rights, but the relevant provisions of the Hague Convention determine whether those rights are considered 'rights of custody' under the Convention." Ozaltin, at 367.

In 2010, the U.S. Supreme Court addressed the issue of whether a particular parental right constituted a "right of custody" under the Hague Convention. In that case, Abbott v. Abbott, 560

U.S. 1, 130 S.Ct. 1983 (2010), the child's mother removed the child to Texas from Chile. The Chilean courts had granted the mother "daily care and control" of the child and the father "direct and regular" visitation rights. Id., 560 U.S. at 6. The father petitioned for return of the child, and the issue was whether the father had "rights of custody" enforceable under the Hague Convention.

The Supreme Court found that since Chilean law provided that a parent with visitation rights also had to authorize if the child left the country, known as a *ne exeat* right, he thus had the right to determine the child's country of residence. Id., at 10, 130 S.Ct. at 1990 (relying on Chilean agency that the right to authorize the child's exit from Chile means that neither parent can unilaterally determine the child's place of residence)(citations omitted)). The Court found that since the Convention specifically states the right to determine the child's residence is a "right of custody," see Convention, art. 5, the father's visitation rights were "rights of custody" under the Convention. Id., at 11.

In this case, the Order concerning their divorce specifically states that the Mother and the Father share "parental rights." Specifically, it states:

> With respect to the minor [R.V.B.], the spouses have agreed that parental rights will continue to be exercised by both parents; the custody and personal care will be held by the mother.

Pet. Ex. B, paragraph Sixth. The 2011 Modification concerning the adjustment to child support payments does not specifically address the parenting rights between the parents, except to restate -- using the same language used in the earlier Order -- that the Mother shall have "the custody and personal care" of the Child. No mention is made of the shared parental rights contained in the original Order.

At the request of the Court, both the Mother and Father have submitted expert reports to address the Father's custody rights under Columbian law. See Pet. Ex. Q & R; Respondent's Report at docket entry ("DE") 31, from Nestor Antonio Sierra Rincon ("Rincon Report"). The Father also submitted a letter from Columbia's Central Authority, ICBF, on this issue. See Pet. Ex. S.

According to the Respondent Mother's expert report, the "parental rights" referenced in the Order, or "patria potestad," refers only to administration of the child's property, and is entirely distinct from the personal care and custody given her only to the Mother. See Rincon Report, at 3. Mr. Rincon further states that even the "patria potestad" rights are limited when that parent has failed to fulfill child support obligations.[8] Importantly, Mr. Rincon states that Columbia law requires that a parent seeking to travel from Columbia with the child needs to obtain authorization from the other parent, even if that other parent only has "patria potestad" rights. Id., at 4.

The Petitioner Father submitted a letter from the Central Authority in Columbia, ICBF, which also states that in Columbia, one parent taking the child from the country "requires permission of departure" from the non-traveling parent. See Pet Ex. S: Letter from Maria Ines Beltran Rusinque of ICBF, Central Authority in Columbia (DE 28). The letter further states that while the Mother here has "the custody, the personal care of the Child, this does not give the

---

[8]There is no clear evidence in the record that the Father has failed to make child support payments while the Child was still in Columbia. Indeed, the Mother confirmed that the Father was making child support payments, but had failed to pay increases. Tr., at 149-151; 177. It is undisputed that the Father did not make payments once the Child was removed from Columbia, yet it is nonsensical that this failure to pay *after* the Child is removed somehow curtails his parental rights for purposes of the Hague Convention petition, as argued by Respondent's expert.

right to change the residence," which would be a breach of the Father's visitation rights. The Father's other expert submission states that "parental rights consists of those joint powers of parents who allow them to fulfill the duties of raising, educating and set the children" and that neither parent can prevent the exercise of the rights of the other. See Pet. Ex. Q: Letter of Jose Manuel Arango Juris, at 2,3 (DE 26).

The Father provided translations of Columbian Law on parenting rights, but this does little to clarify "rights of custody" as defined by the Convention. See Pet. Ex. R: Translation of Title XIV of Columbian law on Patria Potestas, and Title XII on the Rights and Obligations between Parents and Legitimate Children (DE 27).[9] Although not raised by either party, Article 262 clarifies that the "right of personal care," held by the Mother here, is that "[t]he parents or the person entrusted with the care of the person of the children, shall have the power to supervise their conduct, to correct them and to discipline them moderately." This does not address the custody concerns raised by the Convention.

Nevertheless, there is no dispute between the parties that under Columbia law, by nature of at least his visitation rights with the Child, the Father's consent was required for the Child to leave the country. See Pet. Ex. S: Letter from ICBF; Rincon Report, at 4. Indeed, the record reflects that the Father's consent was sought, and given, for the Child to leave Columbia to vacation in New York until December 26, 2011. Tr., at 18, 178, 179-180. The Mother even

---

[9]Neither article provided defines "rights of custody" as used by the Convention, but article 288 of Title XIV states that "the exercise of parental authority over their legitimate children shall be exercised jointly by both parents. In the absence of one of the parents, the other parent shall exercise parental authority." Much of the remainder of the title concerns the parents' responsibility for and entitlement to the property rights of the child. Article 253 of Title XII states the "[b]oth parents or to the surviving father or mother, shall exercise the parental care in the upbringing and education of their legitimate children."

testified that "of course" the Father's consent was sought. Tr., at 178. Here, like in <u>Abbott</u>, the Father's consent was required for the Child to leave the country. In <u>Abbott</u>, the Supreme Court viewed that as one that constitutes a right to establish the child's residency, and as such, is a "right of custody" as defined by article 5 of the Convention. By the same reasoning, the Court here finds that the Father's right to authorize the Child to exit Columbia was a right to establish the Child's residency, and thus a "right of custody" protected by the Hague Convention.

B. <u>Wrongful Removal or Retention of the Child</u>

There is no real dispute in this case that the Father had consented for the Child to travel to New York to visit with the Mother's sister and family until December 26, 2011. <u>See</u> Resp. Findings, at 7-8; Petitioner's Findings, at ¶15; Tr., at 17-18. In light of the Court's finding that the Father had "rights of custody," the Mother's retention of the Child in New York beyond the period of time consented to by the Father was wrongful.

C. <u>Habitual Residence</u>

There is no dispute in this case that Columbia was the Child's habitual residence. It is where her parents were married, it is where she was born, it was where the parents got divorced, and is where the Child has lived for her entire life, until moving to New York. Thus, the Court finds that Columbia is the Child's habitual residence, and it was from there that the Mother wrongfully retained her.

The Court finds that the Petitioner has established that he had rights of custody that were breached by the wrongful removal or retention of the Child from her habitual residence, Columbia, and therefore has established a prima facie claim under the Hague Convention.

## 2. Affirmative Defenses to Prima Facie Case

The Convention provides various affirmative defenses to a prima facie case that the Convention applies and the child should be returned. For example, as noted above, the court may consider whether the child is "settled in its new environment" if the petition has been filed over one year since the wrongful removal. Convention, art. 12; 42 U.S.C. § 11603(e)(2)(B); Lozano, 572 U.S. –, 134 S.Ct. at 1229. The other defenses argued by the Respondent are that the child will suffer "grave risk of harm" if returned to Columbia, see Convention, art. 13(b), and that the opinion of the Child should be considered, as permitted in article 13 of the Convention. See Resp. Findings, at 23-29. The Court will address each separately.

### A. "Well-Settled" Defense

If an action for return of the child has been commenced within one year of the wrongful removal or retention, the judicial authority "shall order the return of the child forthwith." See Hague Convention, art. 12. If more than one year has passed before proceedings have commenced, the authority "shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Id. The respondent opposing return of the child must show that the child is settled by a preponderance of the evidence. See 42 U.S.C. § 11603(e)(2)(B); Lozano, 134 S.Ct. at 1229.

### i. One Year Period

The Convention looks at "the commencement of the proceedings before the judicial authority of the contracting State where the child is" to determine if one year has passed since the wrongful removal or retention. ICARA defines "commencement of proceedings" as used in Article 12 to mean the filing of a petition under 42 U.S.C. § 11603(b). See 42 U.S.C. § 11603(f);

Thus by the plain language of ICARA, any requests or filings made in the home country to have the child returned do not constitute "commencement of proceedings."

Since settlement of the child may be considered if more than one year has passed, the timing issue is significant. The U.S. Supreme Court recently addressed the question of whether the one year time period referenced in article 12 of the Convention could be tolled in certain circumstances. See Lozano v. Montoya, 572 U.S. --, 134 S.Ct. 1224 (2014). In that case, where there had been allegations of domestic violence during the marriage, the mother had taken the child from their home in London, England in November 2008 after concern for her three-year old daughter's behavior around the father. While remaining in the United Kingdom for several months but unable to find suitable housing, in July 2009 the mother took the child to France and several days later, to New York, where the mother's sister lived. Various attempts by the father to find the whereabouts of the mother and child were unsuccessful. The father filed a Hague application in England suspecting the child was in New York, and once the Office of Children's Issues for the U.S. Central Authority confirmed the child was in New York, the father filed a petition under ICARA on November 10, 2010 in the Southern District of New York, sixteen months after the removal of the child from the UK. Loranzo, 134 S.Ct. at 1229-1231.

Following a hearing, the district court found that since more than one year had passed from removal of the child until the filing of the petition, it considered whether the child was settled in New York. Based on a review of the totality of the circumstances, the court found the child was settled in her current environment and denied the return petition. Furthermore, the court rejected the father's argument that the one year period be equitably tolled in light of the mother's concealment of the child. The Second Circuit affirmed, and the Supreme Court granted

certiorari to decide whether article 12's one year period was subject to equitable tolling. Id., at 1231.

The Supreme Court found that equitable tolling was not available. Id. In so deciding, the Court noted that the Hague Convention is a treaty, not a statute, and that signatories to the Convention did not intend tolling to apply. Id., at 1232-1233. Furthermore, the Court found that the one year period was not a statute of limitations that denies the remedy sought -- ie., return of the child. That remedy is still available, and passage of the one year period merely permits consideration of the child's settlement. Id., at 1234-1235. Finally, the Court also noted that if the parties to the Convention wanted an extension of that period, one would have been written in, and to apply a tolling doctrine would undermine the intention of the treaty drafters. Id., at 1236. Thus, despite that the Father's efforts to locate the Child may have started soon after it became clear that the Child would not be returning from New York, and even if they were hampered by the Father's difficulty in locating the Child, the Supreme Court has clarified that none of those events toll the one year period. Since the petition here was filed more than one year after the Child's removal, the Court may consider whether the Child is settled.

ii. Factors on Whether the Child is Settled

The Second Circuit has found that "'settled' should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." Lozano, 697 F.3d 41, 56 (2d Cir. 2012) (citations omitted). Stating that the court may consider "any factor" relevant to the child's living arrangement, the Second Circuit outlined that when evaluating if the child is settled, the factors a court should generally consider are:

(1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

Loranzo, 697 F.3d at 57 (citing Duarte v. Bardales, 526 F.3d 563, 576 (9th Cir. 2008); see also

Matovski v. Matovski, 2007 WL 2600862, at *13 (S.D.N.Y. 2007) (same); Reyes Olguin v. Cruz

Santana, No. 03 CV 6299(JG), 2005 WL 67094, at *8 (E.D.N.Y. 2005) (same); Koc v. Koc, 181

F.Supp.2d 136, 152–54 (E.D.N.Y. 2001) (same)).

The immigration status of the child is not "singularly dispositive" but the importance of

this factor on settlement "will inevitably vary for innumerable reasons, including: the likelihood

that the child will be able to acquire legal status or otherwise remain in the United States, the

child's age, and the extent to which the child will be harmed by her inability to receive certain

government benefits." Loranzo, 697 F.3d at 57. The Second Circuit has declined to adopt a

categorical rule that this factor should only be dictated by the threat of deportation. Id., n. 18; see

also In re D.T.J., 956 F.Supp.2d 523, 537 (S.D.N.Y. 2013) (string citations omitted).

The stability of the child's residence factor is a factor when evaluating if a child is settled.

See Lozano, 134 S.Ct. at 1236 (citing Mendez Lynch v. Mendez Lynch, 220 F.Supp.2d 1347,

1363–1364 (M.D.Fla. 2002) (children not settled when they "lived in seven different locations"

in 18 months)); In re D.T.J., 956 F.Supp.2d at 535 (noting that the stability of the child's new

environment "plays a significant role in the 'settled' inquiry).

The Court finds that the Child here is not sufficiently settled to warrant denying the return

order. The record reflects that since the Child arrived in New York, she has lived in at least three

different locations. Initially, she lived with her Mother's family for about a year until a family

dispute forced she and the Mother to find a new place to live.[10] She then lived with a co-worker for a period of several months.[11] Most recently, the Child and Mother live in a rented apartment in Bayside.

These frequent moves have also caused the Child to attend three different schools since arriving in New York. From January 2012 until the end of that school year, she attended the Clara School. She attended the Covert Avenue School for the 2012-2013 school year (her second grade), and started yet a third school, P.S. 31, in the 2013-2014 school year for third grade. This is not settled. See In re Koc, 181 F.Supp.2d 136, 154 (E.D.N.Y. 2001) (child who has lived in three homes and attended three schools in less than three years is not settled).

Furthermore, the Mother's employment is not settled. She testified that she is currently cleaning offices and babysitting when asked. Tr. at 107. There is evidence that for some unspecified periods of time, she worked at Checkers Restaurant and a laundromat, and it is unclear from the record the reason for her leaving those jobs. The Mother testified that she earns approximately $550 per week and pays $1000 a month in rent. Tr., at 184-185.

Finally, while not a dispositive factor, the immigration status of the Mother is a factor that disfavors finding the Child is settled in her new environment. The Mother testified that she and the Child originally traveled to New York on a tourist visa that expired in either March or April 2012. In September 2012, she applied for residency on behalf on herself and the Child, which application is pending. Thus, the Mother and Child are currently here illegally, and thus

---

[10]The Mother testified that this dispute has been resolved, and offered various pictures showing the Child with the Mother's family, yet the Court notes that the Mother's sister did not appear in court or testify on behalf of the Mother in these proceedings.

[11]The record is unclear on the exact amount of time they lived with the Mother's co-worker.

subject to deportation at any time. While there is no evidence that deportation is imminent, and indeed, may never occur, it is a threat that clouds the Child's daily living. See In re Koc, 181 F.Supp.2d at 154.

Considering all the various factors, and based on the facts that the Child has already lived in various places, has attended three different schools since coming to New York, that the Mother's employment and financial situation are unstable, and the immigration status, the Court finds that Respondent has not proven that the Child is settled in her new environment to deny her return to Columbia. See In re Koc, 181 F.Supp.2d at 154-155 (frequent moves and schools, illegal immigration status and employment instability of mother indicate child is not settled); cf. Broca v. Giron, 530 Fed.Appx. 46, 48 (2d Cir. 2013) (although ultimately affirming that he is settled, "[the child's] immigration status, lack of residential stability, and poor performance in school, as well as his mother's lack of financial stability, counsel against a conclusion that he is well settled.")

B. Grave Risk of Harm

Under article 13 of the Convention, the Court is not bound to return the child if it can be established, by clear and convincing evidence by the respondent, that there is a "grave risk" that return would "expose the child to physical or psychological harm" or otherwise place him or her in an "intolerable situation." See Hague Convention, art. 13(b); 42 U.S.C. § 11603(e)(2)(A). "Grave risk of harm" arises in two situations: "(1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." Souratgar v. Lee, 720 F.3d

96, 103 (2d Cir. 2013) (quoting <u>Blondin IV</u>, 238 F.3d at 162).

In an attempt to establish that the Child will face "grave risk of harm" if returned to Columbia, the Mother points to the domestic violence allegations made by her against the Father in 2007 and 2011 prior to their divorce proceedings, as well as allegations made by the mother of another child and her husband in 2000. <u>See</u> Tr., at 50-51; 54; 56-57. The Mother also points to the personalities of the Father's relatives, as well as her claim that the Child is now settled and the Child's objections to returning to Columbia contribute to the "grave risk" she will face if returned. It is also argued that if the Child is forced to return to Columbia, she may not be able to return to the United States for ten years, which would be detrimental to her future. <u>See</u> Resp. Findings, at 27-29.

The Court finds that the Respondent fails to show by "clear and convincing evidence" that the Child will suffer grave risk of harm if returned to Columbia. The domestic violence allegations between the Mother and Father prior to their divorce are not probative to whether the Child is at a grave risk, nor are the allegations from 2000 at all relevant. "Spousal abuse, however, is only relevant under Article 13(b) if it seriously endangers the child." <u>Souratgar v. Lee</u>, 720 F.3d 96, 103-104 (2d Cir. 2013); <u>see</u> <u>also</u> <u>Lachhman v. Lachhman</u>, 2008 WL 5054198, *9 (E.D.N.Y. 2008) (concluding that evidence of petitioner's previous arrest, but not conviction, on domestic abuse charges was insufficient to establish grave risk where there was no evidence that petitioner had ever harmed child). In fact, the evidence here, including the testimony of both parents, the photographs submitted, and the *in camera* interview of the Child indicate that the Father and Child share a loving relationship, and there is no grave risk of harm to the Child here. Without more, that the Child may not be able to return to the United States for 10 years does not

substantiate grave risk of harm. Respondent also argues that the Child's objection to returning should be considered when deciding if there is grave risk of harm. While the court may consider such evidence, for example if the child testifies that he or she is threatened by a parent, see Reyes Olguin v. Santana, 2005 WL 67094 (E.D.N.Y. 2005) (wishes of children were considered in determining if return would create grave risk), the Child's opinion that she likes it in America "much much better" does not indicate that grave risk of harm exists if she returns. Accordingly, the Court finds that the Respondent has failed to show by clear and convincing evidence that a "grave risk of harm" exists if the Child is returned to Columbia.

C. Opinion of the Child

The unnumbered paragraph of article 13 of the Convention states that the court "may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." This must be proven by a "preponderance of the evidence." 42 U.S.C. § 11603(e)(2)(B).

The Convention does not specify a specific or minimum age of a child to warrant consideration of that child's opinion. In Blondin IV, the Second Circuit noted that "[i]n either case, of course, a court must take into account the child's age and degree of maturity in considering how much weight to give its views." 238 F.3d 153, 166. There, the district court considered the eight-year old child's view as one factor when evaluating whether return of the child to her physically abusive father would cause "grave risk of harm." The Second Circuit found the court "did not clearly err in finding [the child] old and mature enough for her views to be considered in that context." The Court declined to reach the question of whether she had the "age and maturity sufficient for her views to be conclusive" as the sole reason to deny her return

-26-

under Article 13 -- which is the context here. Id., at 167. See also Reyes Olguin v. Santana, 2005 WL 67094 (E.D.N.Y. 2005) (wishes of eight year old and five year old children were considered in determining if return would create grave risk).

Other courts have evaluated whether the opinion of the child can be the sole reason for denying the return petition if found to be "of sufficient age and maturity." Convention, art. 13. For example, in In re D.T.J., 2013 WL 3866636 (S.D.N.Y. 2013), after spending several hours interviewing the 15 year old child, the court found her to be "a mature, thoughtful child with age-appropriate analytic skills and assessments of reality," sufficient to base a denial of the petition on that reason alone. Id., 15, 16. See Matovski v. Matovski, 2007 WL 26000862 (S.D.N.Y. 2007) (consistent and unequivocal opinions of sufficiently mature twelve and eleven year olds are considered; that of five year old is not); In re Koc, 181 F.Supp.2d 136, 154 n. 19 (E.D.N.Y. 2001) (court declines to rely on the statements of a "remarkable eight year-old girl").

The Child here is eight (8) years old. The Court undertook an *in camera* interview to find out about her life in New York and to decipher, what if any, opinion she had on this topic. See Tr., 196-207. The Child is clearly bright, was well-mannered and engaging. She talked about her friends and her tennis lessons. She said that she likes America "much much better" than Columbia, and thinks it is a "better place for her to be." She enjoyed visiting with her Father during his recent visits to New York during the course of these proceedings. She reflected some awareness of the purpose of the proceedings, but appeared to the Court to be reluctant to chose between her Mother and her Father. As she eloquently and simply stated, "I feel like [my Dad] is very nice to me so is my mom. I want to say he isn't better than my mom. I love them the same. I love them both." Tr., at 203.

Despite the Child's charm and maturity for her age, the Court notes that she is only eight years old, and she does not possess the sufficient "age and degree of maturity" such that her opinion could be a sole basis to deny the petition. The Child has adapted to life here as kids do, has made friends, and appears happy. The Court is also conscious of the reality that the Child's opinion that America is "much much better for me" may be driven by a desire, albeit unstated, to continue to live with her Mother. R.V.B. clearly loves both of her parents, and shares a loving relationship with both. Yet, she is still a child. To the extent she articulated an objection to returning to Columbia, the Court finds that her opinion is not sufficiently mature to be considered.

*      *      *

In sum, the Court finds that the Petitioner has established that his rights of custody were breached by the wrongful removal and retention of the Child from her habitual place of residence, Columbia. The Respondent has failed to establish that the Child is settled in her new environment, or that she faces grave risk of harm if returned to Columbia. Considering the Child is eight years old, to the extent she articulated a desire to stay in the United States, the Court finds that she lacks sufficient age and maturity for her objections, such as they are, to be considered. Therefore, Petitioner's petition under ICARA, 42 U.S.C. § 11603(b), is granted, and the Child is ordered to be returned to Columbia forthwith.

Pursuant to 42 U.S.C. § 11607(b)(3), Petitioner also seeks an order that Respondent "pay necessary expenses incurred by or on behalf of the petitioner," which the Respondent may argue is "clearly inappropriate." Petitioner shall submit to the Court within twenty days of this order a request for expenses, including all proof and support for the costs sought.

<u>CONCLUSION</u>

For the reasons stated above, the petition is granted. The Child is ordered to be returned to Columbia forthwith. Petitioner's request for payment of expenses shall be submitted to the Court within twenty days of this order.

SO ORDERED.

s/ Leonard D. Wexler
_____
LEONARD D. WEXLER
UNITED STATES DISTRICT JUDGE

Dated: Central Islip, New York
      July 7, 2014